## George M. Clark & Co. v. William D. Kent, Samuel A. Treat, John R. True and Thomas S. Dobbins.

1. CONSTRUCTION OF STATUTES—*Inserting Words—Sec. 18 of the Act Concerning Corporations.*—Section 18 of Chapter 25, R. S., entitled "An Act Concerning Corporations," is to be construed the same as if the word "or" had been inserted between the word "act" and "before" as they occur in the latter part of the section. (Loverin v. McLaughlin, 161 Ill. 417.)

2. CORPORATIONS—*Individual Liability of Directors.*—Under section 18 of the act concerning corporations, if the board of directors of any stock corporation, or pretended stock corporation, assume to exercise corporate powers, or use the name of any such corporation or pretended corporation, before all stock named in the articles of incorporation is subscribed in good faith, they become jointly and severally liable for all debts and liabilities made by them and contracted in the name of such corporation or pretended corporation.

3. SAME—*Where the Stock is Not Subscribed for in Good Faith.*—Where the persons named in articles of incorporation as subscribers to the stock, subscribe with no intention of ever paying or being called upon to pay the amount of their several subscriptions, but make the subscriptions with the idea that they are merely acting as agents for other persons whose names are not disclosed in said articles, the stock named in said articles of incorporation has not been subscribed in good faith within the meaning and intent of said section 18 of the act concerning corporations.

4. SAME—*Directors Must See that the Stock is Subscribed for in Good Faith.*—The directors of a stock corporation are required to see that all stock named in the articles of incorporation has been subscribed in good faith, otherwise they may be held personally liable, jointly and severally, for the debts of the corporation contracted for by them.

5. SAME—*Fictitious Subscriptions—Intention of the Statute.*—The intention of the statute relating to the organization of corporations is to secure the public, dealing with corporations, against the evils of illegal or incomplete organization, and fictitious subscriptions, by placing upon the managing officers or directors the responsibility of seeing to it that the provisions of the incorporation act shall be fully complied with, and that the subscriptions to the capital stock shall be made in good faith.

**Action** under section 18 of the act concerning corporations to hold directors liable for merchandise sold and delivered, etc. Trial in the Superior Court of Cook County. The Hon. THEODORE BRENTANO, Judge, presiding. Finding and judgment for defendants: appeal by plaintiffs. Heard in this court at the October term, 1898. Reversed, and judgment entered here. Opinion filed February 9, 1899.

George M. Clark & Co. v. Kent.

## STATEMENT.

This action was begun by appellant against appellees, the directors of the Dubuque Building Company, an Illinois corporation, now insolvent, to recover for merchandise sold to the corporation. The suit was brought under section 18 of the corporation act, to hold appellees as directors personally liable, jointly and severally, because they assumed to act as directors of the corporation and contracted debts in the name of the corporation, and otherwise exercised corporate powers, before all the capital stock named in its articles of incorporation had been subscribed in good faith.

The Dubuque Building Company was organized on August 10, 1894. On that date the articles of incorporation were recorded in the office of the recorder of deeds of Cook county. From these articles of incorporation it appears that John S. Brown, Walter H. Browne and James E. Dement signed the usual preliminary statement that they desired to form a corporation, to be known as the Dubuque Building Company; that its object was to operate an apartment building in Chicago; its capital stock, $100,000; the number of shares, 1,000; the amount of each share, $100; its duration, ninety-nine years; its principal office in Chicago. It further appears by the report of two of said commissioners, Walter H. Browne and James E. Dement, that they opened books of subscription; that the stock was fully subscribed; that the following is a true copy of such subscription :

" We, the undersigned, hereby severally subscribe for the number of shares set opposite our respective names, to the capital stock of Dubuque Building Company, and we severally agree to pay the said company for each share the sum of one hundred dollars, in such manner and at such time or times as the board of directors may determine :

| NAMES. | SHARES. | AMOUNT. |
|---|---|---|
| W. J. Price, | 1 | $    100 |
| Walter H. Browne, | 995 | 99,500 |
| Frederick P. Austin, | 2 | 200 |
| John S. Brown, | 1 | 100 |
| Fred W. Hatch, | 1 | 100." |

It further appears from said report that the commissioners convened a meeting of said subscribers by notice, pursuant to law; that said subscribers met and elected as directors E. J. Price, Walter H. Browne, John S. Brown, Frederick P. Austin and Harry B. Gutches. This report of the two commissioners, Walter H. Browne and James E. Dement, is sworn to; they make oath that " the foregoing report by them subscribed is true in substance and in fact."

Immediately after filing the articles of incorporation, the company proceeded in the work of erecting an apartment building, known as the Dubuque Apartment Building in Chicago; it continued in business until December 23, 1895, when it made a voluntary assignment for benefit of creditors to John S. Brown, assignee. A part of its indebtedness was a claim of $660 of George M. Clark & Company, appellant, for gas ranges and labor, furnished the building under written contract made in April, 1895. At the time this contract was made the appellees, William D. Kent, Samuel A. Treat, Thomas S. Dobbins, and John R. True, were the managers or directors of the company, and had been for some time prior thereto, and continued to be up to the time of the assignment in December, 1895. William D. Kent was the president, Samuel A. Treat the secretary and John R. True the treasurer of the company. On the trial the following stipulation was entered into in open court :

"That on or about April 17, 1895, George M. Clark & Company made a written contract with the Dubuque Building Company for the furnishing of gas ranges for the Dubuque building; that the ranges under said contract were actually furnished and went into the building, and that at the time of the assignment, December 23, 1895, there remained due from the Dubuque company, for goods furnished under said contract, the sum of $660, none of which has been paid."

The declaration contained two special counts and the common counts. The first count is drawn on the theory of the Dubuque company *being* a corporation; the second count on the theory of it being a *pretended* corporation; the sec-

ond count is almost exactly like the first count, save where, in the first count, the words "stock corporation" are used, in the second count the words "pretended stock corporation" are used, and save where in the first count the words "being the board of directors" are used, in the second count the words "pretending to be the board," etc., are used. The first count alleges, in substance, that on December 23, 1895, and at divers times prior thereto, beginning with January 10, 1895, the defendants, being the board of directors of the stock corporation, Dubuque Building Company, assumed to exercise corporate powers and use the name of said corporation before all the stock named in the articles of incorporation of said corporation was subscribed in good faith, and so being and assuming, purchased of the plaintiff in the name of the corporation certain goods, etc., at divers times, etc., of the value, etc., and that said goods so purchased were delivered, etc., whereby, and by force of the statute, the defendants became jointly and severally liable to pay, etc., and being so liable, in consideration thereof promised to pay, etc.   Four pleas were interposed: (1) the general issue; (2) denial of joint liability; (3-4) estoppel pleas on ground that plaintiff filed its verified claim against the Dubuque company with the assignee on March 31, 1896.   Demurrers were interposed to the third and fourth pleas and were sustained, leaving two pleas, viz., the general traverse and the denial of joint liability, upon which issues were joined.

The evidence disclosed the following facts:   Singleton, owner of the fee, agreed with Bradley to sell the fee to Bradley, and to take back a lease for 198 years, and to erect an apartment building upon the property.   Bradley was to pay $100,000 for the fee, $42,000 of which was paid upon delivery of deed and $58,000 was to be paid when the building was completed.   Singleton assigned his lease to a corporation known as the Carolina Building and Hotel Company.   That company began the erection of the apartment building, and failed, through financial embarrassment, to complete it.   Among its creditors were appellees, or

companies or firms in which they were interested, who furnished material and did contract work upon the building. In an effort to save themselves as creditors of the Carolina company, they undertook to complete the enterprise. To that end the corporation here in question, the Dubuque Building Company, was organized. An agreement was made by Bradley that he would pay over to the Dubuque Building Company the balance of purchase price due upon completion of the building, which had become reduced to $55,000, instead of $58,000, and which later became reduced, by reason of accruing ground rent, to $53,000. An agreement was made with the Carolina company to permit it to redeem upon certain terms, one of which was that upon such redemption the Carolina company should be credited with the $53,000 paid by Bradley, as by the original agreement, *i. e.*, the $53,000 should not be figured as part of redemption money to be paid by the Carolina company. There were in all twelve creditors of the Carolina company who thus undertook to organize the new company, viz., the Dubuque Building Company. But they chose certain ones of their number to act for them in the premises. The incorporation of the Dubuque Building Company followed. None of these creditors, however, and none of appellees, became, at the organization, publicly identified with such organization. Instead, certain individuals, having no interest in the matter of the proposed incorporation, were induced to sign the preliminary papers, to subscribe for the capital stock, and to become the first board of directors. It is conceded that no one of these original incorporators was a *bona fide* subscriber. On the contrary, it appears to have been distinctly understood that no one of them assumed any responsibility whatever or had the slightest intention of ever paying any part of the amount of his subscription. There is no attempt to maintain the fiction that Browne, who subscribed for 995 shares of the capital stock, paid for the same by transfer of leasehold, or in any other manner.

It appears from the evidence that the only intention of appellees, and the contractors whom they represented, was

George M. Clark & Co. v. Kent.

to pay for stock to the extent of whatever credit might be due to them for work and material upon the building, partly furnished during the management by the Carolina company, and partly furnished during the Dubuque Building Company's management. It was understood that all of the capital stock should be distributed among these contractors; but no understanding was had or obligation assumed by them as to any cash payments for such stock.

The total amount of receipts by the Dubuque Building Company from the time of its organization up to the date of its assignment, is made up as follows:

| | |
|---|---:|
| William L. Bradley, in cash, in accordance with the agreement of April 5, 1894, and which was a part of the original purchase money for the land which Bradley agreed to pay Singleton | $53,000 |
| Labor and material paid for by sale of bonds secured by trust deed on property to amount of | 54,100 |
| Rents from tenants (cash) | 6,639 |
| Labor and material from contractors who were paid in stock | 45,800 |
| Cash from a stockholder to strike a balance on an issue of stock for material furnished | 14 |
| Total receipts | $159,553 |

Mr. Treat, one of appellees, testified:

"I was among others who agreed to take their pay in stock. There is no record of any subscription by me or the others. It was a verbal understanding. There was no written subscription made by us. We agreed to subscribe for the entire issue of stock for finishing up this building, and took our pay in stock. We did not put our names to anything, because none of us at that time knew what the exact amount would be. It was impossible for each of us to know how much stock we were to receive, because we did not know how much our bills for labor and material would amount to. I could not tell how much I would take because I did not know how much the building would cost. I could not fix the amount. I want to be understood that these men (the contractors) subscribed for the entire issue, and that each individual would take stock only when the building was finished.

Q. When you said a little while ago that there was an agreement for the parties composing this syndicate to subscribe for the stock, you did not mean that literally, did you? There was not any agreement that each one of these would subscribe any specific amount, before the corporation was organized, was there? A. No; there was not.

Q. Your recollection of the understanding was that Mr. Browne subscribed these $99,500 as a matter of convenience, and that this stock, that was to go to these several creditors after they had worked on the building, was to come from this block of stock which had been originally subscribed by Walter H. Browne? A. That is it."

Mr. True, one of appellees, testified:

"I was elected to fill a vacancy in the Dubuque Building Company directory about September 26, 1894. I knew that the company from day to day was incurring liabilities for materials and labor. I knew that these gentlemen (the original subscribers) had signed the original subscription to the stock of the company, but I made no inquiries as to their financial responsibility."

Q. When you were elected a director and became treasurer of the company, was it the understanding that the directors or the stockholders, that were made up of the creditors of the old Carolina company, should pay in any money into the corporation? A. It was understood that these contractors should pay for their stock with labor and material; but that they should not put in any money.

The Court: I want to ask you, Mr. True, the amount of stock that you were entitled to. Was it in payment of the work already done on the Carolina building, and the work you did subsequently on the Dubuque building?

A. Yes, sir; for both. That is the way the contractors were to get their pay.

Mr. Elliott: Is it not true, Mr. True, that in case the amount of work done should not equal the amount of stock, that is, if there should be any stock remaining after it had been apportioned to these contractors for work done, that what was left should be divided in proportion to what they had received; that is, if the building cost $50,000 to complete it, the remaining fifty should be divided among all of them, in, proportion to the amount they had already received? A. Yes, sir.

Mr. Gridley: Were you to pay that remaining $50,000 in cash? A. My impression is, it was to be paid for with the money that came from Bradley, with the lease.

George M. Clark & Co. v. Kent.

The Court: Supposing, after everybody was paid, there was a certain amount of stock left over; was that to be a gratuitous distribution, and was that to be distributed in proportion to the amount already received?

A. My understanding was, it was to be distributed *pro rata*. The money that came from the lease was to pay that up; that was my understanding of the matter.

Mr. Gridley: Was there any arrangement at all that the members of this syndicate, including yourself, were personally liable to somebody for that balance of the stock? A. Not that I know of."

It is practically undisputed that neither Browne, who subscribed for 995 shares, nor any other of the subscribers to the stock, was a *bona fide* subscriber.

On cross-examination Mr. Browne testified:

".When I signed this stock subscription list, I acted for the contractors who had been building the building that was afterward known as the Dubuque building. I did not subscribe for any stock myself on my own account. I did not consider that I was incurring any liability when I signed .it. I never agreed to take any stock in the Dubuque company. I never attempted to pay anything for this lease. I did not have any interest in the lease which was assigned to me. I did not ever get anything for any of the stock. I did not attempt to pay for any of the stock by lease. I considered that I was representing the contractors who had been completing the Dubuque building. I did not say anything to Mr. Partridge nor to anybody else at the time as to having a new certificate for any number of shares reissued in my name. I did not sell to anybody any part of these 995 shares of stock; I just surrendered them to the company. No one ever suggested to me that I should subscribe for this stock in the Dubuque company about to be formed. Mr. Oliver asked me to sign the subscription list, and I did so."

Counsel for appellees made the following admission upon the trial:

" There is no contention here that Mr. Browne was able to pay for that stock. He did not subscribe for it; he never intended to pay a dollar on it himself; he did not take it himself."

There is no controversy as to the amount due to appel-

lant, nor as to the fact that the indebtedness was incurred by appellees in the name of the corporation.

The issues were submitted to the court below, without a jury, and the finding and judgment of the court were for appellees, defendants there.

PADEN & GRIDLEY, attorneys for appellant.

The statute requires that the stock "named in the articles of incorporation" must be subscribed in good faith. Loverin v. McLaughlin, 161 Ill. 417; People v. Chicago Gas Trust, 130 Ill. 268.

The statute says "subscribed" in good faith, not paid. Diversey v. Smith, 103 Ill. 378.

What is "good faith" in a stock subscription? See 2 Am. & Eng. Ency. Law, 447 (note); 8 Am. & Eng. Ency. Law, 1361; Jersey City Gas Co. v. Dwight, 29 N. J. Eq. 242; Thompson on Corp., Secs. 1724–1726; Holman v. State, 105 Ind. 569; Whetstone v. Crane Co., 1 Kan. App. 320.

Persons attempting to incorporate under a general statute are held to a strict compliance with the statutory provisions. Beach on Pri. Corp., Sec. 16; Bigelow v. Gregory, 73 Ill. 197; Kaiser v. Bank, 56 Iowa, 104; Abbott v. Omaha Co., 4 Neb. 416.

However honest in intention they may have been is immaterial. Beach on Pri. Corp., Sec. 16; Kaiser v. Bank, 56 Iowa, 104; Trust Co. v. Floyd, 47 Ohio St. 525; Whetstone v. Crane Co., 1 Kan. App. 320.

The statute requires that the stock shall be subscribed by the subscribers, and none of the members of this syndicate subscribed to any stock, either in the original articles, or in any outside subscription, by which they may be bound. Century Dictionary (Subscribe); 24 Am. & Eng. Ency. Law, 326; Fanning v. Ins. Co., 37 Ohio St. 339; Vreeland v. N. J. Stone Co., 29 N. J. Eq. 188; Tonica R. Co. v. Stein, 21 Ill. 96; Thrasher v. Pike Co. R. Co., 25 Ill. 393; Stowe v. Flagg, 72 Ill. 397.

The report of the commissioners, sworn to, in the articles of incorporation, estops defendants from assuming this

position.  Loverin v. McLaughlin, 161 Ill. 417; Appeal of Rowley, 115 Penn. 150; 9 Atl. Rep. 329.

The general rule, supported by the concurrence of most of the courts, is that where the charter or governing statute fixes the amount of capital which the corporation shall have, and does not authorize it to commence business with a less amount, no assessment can be made upon the subscribers until the capital so fixed has been all filled up by *bona fide* subscribers.  Thompson on Corp., 1724.

"Good faith consists in an honest intention to abstain from taking any unconscientious advantage of another, even through the forms or technicalities of law, together with an absence of all information or belief of facts which would render the transaction unconscientious."  8 Am. & Eng. Ency. Law, 1361.

This court should not only reverse the judgment of the lower court, but enter judgment against the appellees, and in favor of the appellant, in the sum of $660.

The statute confers the right to do so.  Secs. 80 and 87, Chap. 110, R. S. Ill.

The decisions sustain such practice.  Manistee Lumber Co. v. Bank, 143 Ill. 490; Everts v. Lawther, 165 Ill. 487.

EDWARD STARTZMAN ELLIOTT, attorney for appellees.

All the stock was subscribed in good faith as required by the statute, because responsible persons manifested an honest intention to acquire the ownership of the entire issue of stock; and whenever an intent to become a subscriber is manifested, the courts hold, without particular reference to formality, that the contract of subscription subsists.   Sec. 18, Chap. 32, R. S. Ill.; Cook on Stock & Stockholders, Sec. 52; 23 Am. & Eng. Ency. of L. 786.

In no instance is it necessary for a party to sign his own name in order to become the principal to a contract; but whether a party shall be considered as acting for himself or as the agent of another depends, not upon the fact that he contracted in his own name without disclosing his agency, but upon the facts and circumstances in the case.

Parol evidence is always admissible to show that an additional party is the real principal, and when this fact is disclosed he is bound as such, regardless of who signed for him.   Collins v. Butts, 10 Wend. 400; Fishback v. Brown, 16 Ill. 74; Ford v. Williams, 21 How. (U. S.) 289; Higgins v. Senior, 8 M. & W. 144; Bynington v. Simpson, 134 Mass. 169.

No particular form of stock subscription is necessary, and even without a formal subscription, or where it is irregular, the courts have uniformly held that the contract of subscription may be inferred from acquiescence and acceptance of the benefits of membership in the corporation; and in this particular case the syndicate of contractors not only acquiesced in the subscription, and put themselves in a position to receive any possible benefits that might result from membership in the corporation, but they likewise promptly assumed the liabilities and responsibilities of membership as well.   Boggs v. Olcott, 40 Ill. 303; Jewell v. Rock River, etc., Co., 101 Ill. 57; 23 Am. & Eng. Ency. of L., 786.

MR. JUSTICE SEARS delivered the opinion of the court.

Section 18 of the Corporation Act provides as follows :

" If any person or persons being, or pretending to be, an officer or agent, or board of directors, of any stock corporation, or pretended stock corporation, shall assume to exercise corporate powers, or use the name of any such corporation, or pretended corporation, without complying with the provisions of this act, (or) before all stock named in the articles of incorporation shall be subscribed in good faith, then they shall be jointly and severally liable for all debts and liabilities made by them, and contracted in the name of such corporation, or pretended corporation."

The word " or " included above in brackets, is not written in as a part of the statute.   But the Supreme Court have so construed section 18, as to make it operate as if the word " or " had been so written in as a part of it.   Loverin v. McLaughlin, 161 Ill. 417.

The statute as so construed operates, therefore, to make directors of a corporation personally liable for all debts and

George M. Clark & Co. v. Kent.

liabilities made by them, and contracted in the name of the corporation before all the capital stock named in the articles of incorporation has been subscribed in good faith.

The question presented here is whether upon the facts of this case all the capital stock of the Dubuque Building Company named in its articles of incorporation had been subscribed in good faith when appellees incurred the debt and liability to appellant in the name of that corporation.

It is admitted that no such *bona fide* subscription had been made by the ostensible subscribers who signed their names to the subscription list. But it is contended that they were but acting for appellees and others, the contractors, and that the contractors were in reality the *bona fide* subscribers. To this we can not assent. In order to constitute them such *bona fide* subscribers, it was essential that they should have intended to have taken and paid for all the capital stock, that they should have obligated themselves to so do, and that their intention and obligation in this behalf should have been published to the world by their signatures to the subscription list. In no one of these particulars were these requisites complied with. They did intend to take all the capital stock, but it is conclusively established by testimony of at least one of their number, which is practically uncontradicted, that they did not intend to pay for all of such stock. Neither did they obligate themselves to pay any subscription beyond such amount as the labor and material furnished might cover. And their names as subscribers, indicating to the public their undertaking and obligation, were not published as subscribers to the capital stock. If they had not chosen to come forward and so declare themselves, the public could not have learned that they were obligated as subscribers to any extent whatever; and now that they do so declare themselves, it is learned that they are not so obligated to the extent of the entire amount of the capital stock named in the articles of incorporation.

There were, then, no *bona fide* subscribers to all of the capital stock when this debt was incurred by appellees in

the name of the corporation. Therefore, they are liable under the provision of section 18 above set forth.

But it is argued that the full amount of stock subscription has been paid, and that such payment is conclusive of the *bona fides* of the subscribers. It appearing that the contractors were not subscribers at all, and it being conceded that they who did subscribe were not *bona fide* subscribers, it is difficult to perceive how any fact, however well established, can be said to conclusively show that which the parties, by their counsel, admit to be untrue. However, the question is obviated by the fact that no such complete payment was ever made. The amounts paid into the corporation, which it is contended constitute such payment in full, are $53,000 received from Bradley, being the unpaid part of the purchase price of the land, and the $45,800 of labor and materials contributed by the contractors, and $14 actually paid in cash. These sums do not, together, make up the $100,000 subscribed. The amounts received for rent and for bonds issued are not claimed to so apply. Nor can the $2,000 deducted by Bradley from $55,000, which he had agreed to pay, apply, nor can any part of the money paid by him be held to have been paid by the subscribers upon their stock subscription. This $53,000 was not even absolutely an asset of the corporation; for if the Carolina Building Company redeemed, that amount inured to the benefit of that company.

It is argued somewhat strenuously, that the method of organizing corporations here attempted, is a method sanctioned by custom and practice. Whether customary or not, it is a method which, under the provision of the statute and its interpretation by our Supreme Court, imposes a liability upon those thus assuming to act as directors.

In Loverin v. McLaughlin, *supra*, the court said of the statute in question:

"The intention was to secure the public, dealing with corporations, against the evils of illegal or incomplete organization, and fictitious or bogus subscriptions, by placing upon the managing officers or directors the responsibility of seeing to it, that the provisions of the incorporation act

shall be fully complied with, and that the subscriptions to the capital stock shall be made in good faith. * * * The capital stock is not required to be paid in cash, but only to be subscribed. What is to prevent the making of subscriptions by impecunious and irresponsible parties ? No provision is made for examination as to the financial ability of the subscribers. But there is provision made in section 18 for careful investigation by the managing officers and directors. They are required to see to it, that all stock named in the articles of incorporation shall be subscribed in good faith."

The judgment of the Superior Court is reversed, and judgment is entered here for $660, the amount which it is stipulated is due to appellant. Reversed, and judgment here.